**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-19-01327-001-TUC-RM (EJM) |
| Plaintiff, | **ORDER** |
| v. | |
| Jason Johnson, | |
| Defendant. | |

On July 31, 2019, Defendant Jason Johnson filed a Motion to Dismiss Indictment or Suppress Defendant's Statements, arguing that statements he made to law enforcement should be suppressed based on alleged violations of *Miranda v. Arizona*, 384 U.S. 436 (1966). (Doc. 22; *see also* Docs. 46, 51.) Defendant later moved to suppress the results of law enforcement's search of his cell phone on the grounds that the search produced evidence obtained as a product of the violation of Defendant's Fifth Amendment rights. (Doc. 46.)[1] On November 19, 2019, Magistrate Judge Eric J. Markovich issued a Report and Recommendation ("R&R") (Doc. 60), recommending that this Court grant

---

[1] Defendant filed two Supplemental Memoranda (Docs. 46, 51) to the original Motion to Dismiss or Suppress (Doc. 22). Defendant's arguments relating to suppression of the results of the cell phone search were raised for the first time in the first supplemental memorandum. (Doc. 46 at 7.) However, since Doc. 46 was filed as a supplemental memorandum and not as a motion, the Court will rule on Defendant's request to suppress the results of the cell phone search as part of the original Motion to Dismiss or Suppress (Doc. 22).

Defendant's request to suppress his statements but allow the Government to use Defendant's voluntary statements for impeachment purposes. The R&R additionally recommends denying Defendant's request to suppress the results of the search of Defendant's cell phone and denying Defendant's Motion to Dismiss Indictment. (*Id*.) Both parties filed Objections to the R&R (Docs. 61, 63) and Responses to the opposing party's Objections (Docs. 65, 66). For the following reasons, the R&R will be adopted as set forth below.

**I.    Background**

On April 24, 2019, Defendant was arrested at the Border Patrol Checkpoint on State Route 86 ("SR 86") in Sells, Arizona. (Doc. 60 at 3.) He was charged by indictment on May 22, 2019 with one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), one count of conspiracy to transport illegal aliens for profit in violation of 8 U.S.C. § 1324(a)(1), and three counts of transportation of illegal aliens for profit in violation of 8 U.S.C. § 1324(a)(1). (Doc. 18.) On January 15, 2020, the Government obtained a superseding indictment to include possession of ammunition by a prohibited possessor. (Doc. 69.)

The R&R summarizes the events leading to the arrest and indictment of Defendant as follows:

> On or about April 24, 2019, at or near Sells, in the District of Arizona, United States Border Patrol Agents (BPA) working the Border Patrol Checkpoint on State Route 86 (SR86) observed a maroon Nissan Rouge [sic] approach. The agent observed four visible occupants in the vehicle as it approached the inspection area. A driver, a front seat passenger, and two back passengers. The driver was identified as Jason Johnson. Johnson stated the individuals in the car were his sisters. While in secondary, agents discovered the three passengers didn't have valid immigration documents to be legally present in the United States. The passengers were identified as Doris Nolasco-Perez, Nancy Gomez-Gomez, and Adelaida Tomas-Morales.
>
> BPA allowed Johnson to use the portable toilet at the checkpoint and then placed him back in a BPA vehicle. During the search of the vehicle, BPA discovered a box that holds 50 rounds of 9 mm Blazer Ammunition (46 rounds in the box) and one magazine pouch with two loaded magazines. Under the front passenger seat, BPA agents found another magazine pouch

with two loaded magazines. A searched [sic] of the portable toilet was conducted and a 9mm Witness-P-S, serial number MT23612, firearm was found at the bottom. A record checks [sic] on the firearm revealed it was reported stolen in Tempe, Arizona.

The ammunition from the magazine that was in the firearm was removed and there were 17 rounds in the magazine, 4 of which matched the missing rounds from the Blazer Ammunition box which was located under the driver's seat.

In his post-Miranda interview, Johnson stated he was being paid $900 per illegal alien. Johnson admitted the gun was his and the bullets in the gun would match the ones found in the vehicle.

(Doc. 60 at 3.)

On September 27, 2019, Judge Markovich held an evidentiary hearing on Defendant's Motions to Dismiss or Suppress. (Doc. 32.) At the evidentiary hearing, the Government called one witness, Special Agent Josh Dienstmann. (*See* Doc. 48.)

Mr. Dienstmann testified that he is an agent with Homeland Security Investigations and has been stationed in Sells, Arizona for three and a half years. (*Id.* at 4-5.) Prior to that he was a Border Patrol agent for eight years. (*Id.* at 5.) Agent Dienstmann estimated that he had conducted fifty custodial interviews of suspects prior to his interview of Defendant. (*Id.*) Prior to interviewing Defendant, Agent Dienstmann spoke with the Border Patrol agents who arrested Defendant at the checkpoint and learned that the agents had discovered three female illegal aliens in the vehicle Defendant was driving, as well as a firearm and ammunition. (*Id.* at 7.)

Agent Dienstmann interviewed Defendant on April 24, 2019 beginning at 3:43 p.m. in an office at a Border Patrol facility in Tucson, Arizona. (*Id.* at 7-8.) Border Patrol agent Hector Gonzalez-Hernandez also participated in the interview. (*Id.* at 8.) Both agents took notes during the interview and some portions of the interview were audio recorded. (*Id.* at 9, 12.) The interview occurred in three parts: a first portion that was recorded with Defendant's knowledge, a middle unrecorded portion, and a third portion recorded without Defendant's knowledge. (*See* Gov't Exh. 7.) At the beginning of the

interview, an audio recorder was placed on a desk situated between the agents and Defendant. (*Id*. at 9.) Agent Dienstmann and Agent Gonzalez-Hernandez were dressed in plain clothes and did not have their service weapons. (*Id*. at 9-10.) The door was not locked, it was daylight outside, and Defendant was not physically restrained in any way. (*Id*. at 10-11.) Agent Dienstmann testified that he never yelled at, threatened, or coerced Defendant. (*Id*. at 11.) He testified that he read Defendant his *Miranda* rights (*id*. at 11) and asked him if he understood those rights (*id*. at 25). Agent Dienstmann did not recall whether Defendant signaled his understanding or non-understanding of his rights. (*Id*. at 25-26.)[2] Defendant then asked Agent Dienstmann why he was not read his rights when agents handcuffed him in the field. (*Id*. at 26; Gov't Exh. 7 at 3.) Agent Dienstmann responded "[b]ecause they weren't asking you any questions?" (Gov't Exh. 7 at 3.) Defendant responded that they did. (*Id*.) Agent Dienstmann then asked Defendant to tell him about what happened earlier that day. (*Id*.; Doc. 48 at 26.) Defendant proceeded to answer Agent Dienstmann's questions. (Doc. 48 at 26.) After the interview had concluded, at about 5:00 p.m., Defendant signed a written waiver of his *Miranda* rights. (Gov't Exh. 5; Doc. 48 at 12-13.)

During the initial portion of the interview, which was recorded, Defendant admitted to picking up aliens, but added that they were dressed nicely, unlike those that "usually come out in camouflage." (Gov't Exh. 7 at 5-6; Doc. 48 at 14.) Defendant stated that he would be paid $900 and that he "did it" because he was going through a divorce. (Gov't Exh. 7 at 9; Doc. 48 at 14-15.)

At this point in the interview, Defendant told the interviewing officers that he would tell them "anything" if they turned off the recorder. (Gov't Exh. 7 at 9-10; Doc. 48 at 15.) Agent Dienstmann turned off the recorder at 3:50 p.m. and continued the interview with the recorder off. (Gov't Exh. 7 at 10.) The interview continued from 3:50 to 4:16 p.m. (Doc. 48 at 16.) Agent Dienstmann testified that, during the unrecorded

---

[2] The transcript of the interview, discussed in detail *infra*, indicates "no oral response" from Defendant after he was read his *Miranda* rights and asked whether he understood them. (Gov't Exh. 7 at 3.)

- 4 -

portion, Defendant stated that he had picked up the aliens in Sells, Arizona on April 24th and that he had smuggled aliens three weeks prior. (*Id.*) Defendant talked about a woman in Phoenix with whom he had contact regarding transportation of aliens. (*Id.* at 16-17.) He stated that he had been picking up aliens once or twice a week since January. (*Id.* at 17.) Agent Dienstmann requested Defendant's permission to search his cell phone; Defendant signed a consent to search form at about 4:00 p.m. (*Id.* at 22-23; Gov't Exh. 6.)

At about 4:16 p.m., Defendant asked to use the restroom. (Doc. 48 at 17.) While Defendant was absent from the interview room, Agents Dienstmann and Gonzalez-Hernandez decided to place another recording device in the room and turn it on without Defendant's knowledge. (Gov't Exh. 7 at 10-11; *Id.* at 18.) They placed the second recording device on top of a microwave to Defendant's left and kept the first recording device turned off on the desk in the middle of the room. (Doc. 48 at 18.) Agent Dienstmann turned on the second recording device at about 4:18 p.m. and the interview resumed at about 4:20 p.m. (*Id.* at 19.)

The third portion of the interview lasted until 4:52 p.m. (Gov't Exh. 7 at 44.) The parties do not dispute that Defendant was unaware he was being recorded during this portion. Defendant admitted that the firearm recovered from the portable toilet at the SR 86 checkpoint belonged to him. (Doc. 48 at 20-22.) Defendant asked what he would get out of answering questions. (Gov't Exh. 7 at 27.) Agent Dienstmann responded, "Like I said, I can't make you any promises. What I'm going to do is I'm going to tell the attorneys and I'm going to tell my boss that you were honest with me, which you have been, and I really appreciate it, and I know it's been hard. And they're going to take that into consideration when they make their decisions." (*Id.* at 27-28.) Agent Dienstmann told Defendant that he would have to go to jail that night. (*Id.* at 28.) Defendant continued to converse with Agent Dienstmann. (*Id.* at 29-44.) Defendant provided Agent Dienstmann with additional information about the gun and about a drug deal in which he was supposed to be involved. (*Id.*) Agent Dienstmann testified that he did not promise

Defendant leniency, or a specific outcome, based on his statements to the agents. (Doc. 48 at 23.)

On cross-examination, Agent Dienstmann testified that he could not recall if Defendant gave him a response when asked if he understood his *Miranda* rights and would answer questions. (*Id.* at 26.) Agent Dienstmann agreed with defense counsel that he interpreted Defendant's statements, made after his non-verbal or non-response to whether he understood and waived his *Miranda* rights, as agreeing to answer the agents' questions. (*Id.* at 27.) Agent Dienstmann further agreed with defense counsel that Defendant's only admission during the first recorded portion of the interview was that he was going to be paid $900. (*Id.* at 29.) The Agent stated that he understood Defendant would only continue speaking with him if the recorder was off. (*Id.*) Defendant checked the recorder to make sure it was off. (*Id.*) After that, during the unrecorded portion of the interview, Defendant admitted to transporting illegal aliens. (*Id.* at 29-30.) Defendant did not say anything about the gun. (*Id.* at 30.) At 4:16 p.m., Defendant used the restroom and Agent Dienstmann remained in the interview room. (*Id.* at 31.) While Defendant was gone from the room, Agent Dienstmann and Agent Gonzalez-Hernandez turned on the second hidden recorder. (*Id.* at 31-32.) Agent Dienstmann admitted that he kept the first recorded turned off on the table so that Defendant would believe that he was still not being recorded. (*Id.* at 33.) During the third, surreptitiously recorded portion of the interview, the agents paraphrased the information they had obtained during the unrecorded portion of the interview and got Defendant to agree that he had made those statements. (*Id.* at 33-34; Gov't Exh. 7 at 11-16.)

Agent Dienstmann then testified as to his training and knowledge of the law regarding surreptitious recording of custodial interviews. (Doc. 48 at 35.) He agreed that he received training and updates on law related to interrogations and *Miranda* but denied knowledge of the *Arnold v. Runnels*[3] case cited by the defense in its Motion to Suppress.

---

[3] The transcript of the evidentiary hearing (Doc. 48 at 35) and the R&R (Doc. 60 at 8) refer to "*Arnold v. Reynolds*." However, the case is *Arnold v. Runnels*, 421 F.3d 859 (2005).

- 6 -

(*Id*. at 35; Doc. 22 at 6-7.) At the end of the evidentiary hearing, Judge Markovich requested supplemental briefing on the issue of whether Defendant waived his *Miranda* rights. (Doc. 48 at 43-44.) On October 25, 2019, Judge Markovich requested further briefing on whether Defendant was challenging the initial *Miranda* waiver and seeking suppression of the entire interview, and he directed the parties to review *United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008). (Doc. 50.)

## II. Standard of Review

A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations" of a magistrate judge. 28 U.S.C. § 636(b)(1). The district judge must "make a de novo determination of those portions" of a magistrate judge's "report or specified proposed findings or recommendations to which objection is made." *Id.* The advisory committee's notes to Rule 72(b) of the Federal Rules of Civil Procedure state that, "[w]hen no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation" of a magistrate judge. Fed. R. Civ. P. 72(b) advisory committee's note to 1983 addition; *see also Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999) ("If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error."); *Prior v. Ryan*, CV 10-225-TUC-RCC, 2012 WL 1344286, at *1 (D. Ariz. Apr. 18, 2012) (reviewing for clear error unobjected-to portions of Report and Recommendation).

## III. Discussion

### A. Motion to Suppress Defendant's Statements

In his Motion to Suppress, Defendant first argues that his statements made during the third portion of the interview, in which he was surreptitiously recorded, should be suppressed because he had selectively invoked his *Miranda* rights and the agents' actions violated his invocation. (*Id.* at 6-7.) Although the Government does not concede that suppression is warranted, it has agreed not to use the third, surreptitiously recorded portion of the interview in its case-in-chief. (Doc. 27 at 8-9.) The R&R recommends

suppressing the third, surreptitiously recorded portion of the interview. (Doc. 60 at 9.) Although the Government's agreement not to use the surreptitiously recorded portion of the interview arguably renders this portion of Defendant's Motion moot, the Court will adopt the R&R's recommendation to suppress the surreptitiously recorded portion of the interview.

Defendant further argues that all of his statements to the agents should be suppressed because the Government has not met its burden to show that Defendant knowingly and voluntarily waived his *Miranda* rights. (Doc. 22 at 7-8; Doc. 46 at 9; Doc. 51.) Defendant contends that his interactions with Agent Dienstmann after being read his *Miranda* rights did not show that he understood and waived his rights. (Doc. 51 at 4.) The relevant portion of the transcript reads as follows:

> S.A. Dienstmann: [Reads *Miranda* rights.] Do you understand?
> Jason Johnson: (No oral response.)
> S.A. Dienstmann: All right.
> Jason Johnson: Hey, why you – hey, why you didn't read me those rights when – 'cause – 'cause—
> S.A. Dienstmann: What's that?
> Jason Johnson: Why they didn't read me those rights when they put the cuffs on me?
> S.A. Dienstmann: Because they weren't asking you any questions?
> Jason Johnson: Yeah, they did.
> S.A. Dienstmann: Okay. Well, tell me about today. What happened today?
> Jason Johnson: Um, I got pulled over at the checkpoint.

(Gov't Exh. 7 at 3.) Defendant went on to answer Agent Dienstmann's questions. Defendant argues that the Government had a duty to clarify his understanding and waiver of his rights and failed to do so pursuant to *United States v. Rodriguez*, 518 F.3d 1072 (9th Cir. 2008). (Doc. 51 at 4-5.) Defendant further argues that he did not impliedly waive his rights by answering Agent Dienstmann's questions because, rather than "blurt[ing] out a confession after receiving and understanding a *Miranda* warning," he questioned why he had not been read his rights earlier and then made a series of non-incriminating statements and one potentially incriminating statement before asking that

the recorder be shut off. (*Id*. at 5.)

The Government, opposing suppression, argues that Defendant impliedly waived his *Miranda* rights by answering questions after he received the *Miranda* warning, and that he expressly waived them when he signed the written waiver following the interview. (Doc. 27 at 6.) The Government further argues that Defendant knowingly and voluntarily waived his rights and there was no "confusion" on Defendant's part. (*Id*. at 7; Doc. 54 at 7-11.) Finally, the Government argues that the "duty to clarify" argument raised by Defendant was effectively overruled by the Supreme Court in *Berghuis v. Thompkins*, 560 U.S. 370 (2010).

The R&R recommends granting Defendant's request to suppress all of his statements to law enforcement because "Agent Dienstmann did not fulfill his duty to clarify whether the defendant understood his *Miranda* rights" and therefore "the *Miranda* waiver was invalid." (Doc. 60 at 16.) In analyzing the parties' legal and factual arguments, the R&R finds that, given the circumstances in this case, Agent Dienstmann did not comply with the directive of *Rodriguez* to "clarify any ambiguity [in Defendant's understanding or waiver of rights] before beginning general interrogation." 518 F.3d at 1080. (Doc. 60 at 14-15). The R&R finds that Defendant's responses to Agent Dienstmann regarding his rights were not only "ambiguous and equivocal" but also "demonstrated a confusion as to if and when *Miranda* rights applied." (*Id*. at 15.) The ambiguity and confusion in Defendant's response "triggered a duty for Agent Dienstmann to clarify" whether Defendant understood and was willing to waive his rights. (*Id.*) The R&R further finds that "a duty to clarify still exists in the Ninth Circuit after *Berghuis* when there is ambiguity as to whether the defendant understands his *Miranda* rights." (*Id*. at 14.) Although it recommends suppressing all of Defendant's statements based on a violation of *Miranda*, the R&R recommends allowing the Government to use Defendant's statements for impeachment purposes because the statements were voluntary. (*Id.* at 16-17.)

. . . .

### 1. Government's Objection to Suppression of Statements

The Government objects to Section B of the R&R, in which Judge Markovich recommends that Defendant's statements be suppressed in their entirety in the Government's case-in-chief. (Doc. 61.) The Government asks the Court to rule that Defendant's statements made prior to the surreptitiously recorded portion of the interview are admissible in the Government's case-in-chief. (*Id*. at 7.) The Government argues that Defendant knowingly and impliedly waived his *Miranda* rights at the outset of the custodial interview. (*Id*.) It argues that the waiver was valid because Defendant "never stated or suggested he was confused or did not understand [the warnings]." (*Id*.) The Government contends that Defendant's statements "did not reflect any lack of understanding about his *Miranda* warnings" and characterizes Defendant's response to the warnings as mere "curiosity," not "confusion." (*Id*. at 9, 14.) It maintains that, after Agent Dienstmann received "no indication from Defendant that he did not understand his rights," the agent "reasonably moved on" and began questioning Defendant. (*Id*.) The Government describes this interaction as "a classic case of implied waiver." (*Id*. at 10.)

The Government relies on *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) to support its argument that Defendant's uncoerced statements to the agent after receiving his *Miranda* warnings constituted an implied waiver of his rights. (*Id*. at 10-11.) The Government, citing *Berghuis*, argues that Defendant impliedly waived his rights by engaging in a "course of conduct indicating waiver," 560 U.S. at 384, but the Government does not address *Berghuis*'s requirement (adopted from *Miranda* and other cases) that a defendant must understand his rights before he can waive them. 560 U.S. at 382. The Government further argues that the fact that Defendant signed a *Miranda* waiver form after the custodial interview concluded is further proof that his waiver was knowing and voluntary. (*Id*. at 11.) The Government cites *United States v. Mir*, 224 F. Supp. 3d 217-19 (S.D.N.Y. 2016) to support the proposition that a written waiver signed at the end of the interview "does not mandate the suppression of [] statements." (*Id*. at 12.)

The Government goes on to contest Judge Markovich's analysis of *Rodriguez* and contends that *Rodriguez* has been "effectively overruled" by *Berghuis*. (*Id*. at 14.) In support of its argument, the Government cites a case from the 2nd Circuit Court of Appeals, *United States v. Plugh*, 648 F.3d 118, 126-27 (2d. Cir. 2011), in which that court relied on *Berghuis* to hold that "custodial officers have no obligation. . . to ask only questions intended at clarifying an ambiguous statement." *Plugh*, 648 F.3d at 126-27.

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis*, 560 U.S. at 382 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). The waiver must be voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)); *see also Tague v. Louisiana*, 444 U.S. 469, 470 (1980) (burden rests with the prosecution, not the defendant, to show that the defendant knowingly and intelligently waived *Miranda* rights); *Carnley v. Cochran*, 369 U.S. 506, 516 (1962) (evidence in the record must show that the accused "intelligently and understandingly" waived his right to counsel). The waiver inquiry consists of "two distinct dimensions": whether it was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. at 382-83 (citing *Burbine*, 475 U.S. at 421).

The transcript of the interrogation, combined with the agent's testimony presented at the evidentiary hearing, make clear that the Government has not met the voluntary, knowing, and intelligent standard. The problem with Defendant's statements made immediately after receiving the *Miranda* warnings is not, as the Government contends, that he "never affirmatively stated that he understood his rights," nor that he made an "ambiguous" invocation of them. (Doc. 61.) The law clearly does not require a suspect to affirmatively invoke his rights in order to waive them. *See Berghuis*, 560 U.S. at 381.

Rather, the problem is that Defendant's statements, viewed within the totality of the circumstances, expressed a misunderstanding of the nature of his rights. As a result, any "implied waiver" that occurred once Defendant began answering questions was not a knowing and intelligent waiver. *Johnson*, 304 U.S. at 464 ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege.")

The record does not show that Defendant "intentionally relinquish[ed]" a "known right or privilege." Instead, the record shows that Defendant did not fully understand the nature of his *Miranda* rights at the time the Government alleges he impliedly waived them. In asking why he was not read his rights earlier that day, when he was arrested and handcuffed, Defendant conveyed confusion as to when and why the *Miranda* warnings applied to him. While his statements did show that he associated the *Miranda* warnings with law enforcement contact, his statements also indicated that he did not understand that his *Miranda* rights applied specifically to custodial interrogation. Furthermore, Defendant's request to the agents to shut off the recorder before making incriminating statements during the second, unrecorded portion of the interview (Gov't Exh. 7 at 10), further reveals Defendant's misunderstanding of his rights. Had Defendant understood his *Miranda* rights, he would have understood that the crux of the matter was whether he would agree to speak with the agents—not whether they recorded his statements. The Court disagrees with the Government's characterization of Defendant's questions as mere "curiosity." His questions about the timing and location of his receipt of the warnings, as well as his unwillingness to make incriminating statements while being recorded but subsequent willingness once the recording was turned off, indicate that he did not understand his rights and was therefore incapable of waiving them.

The Government's arguments based on its reading of *Berghuis* in the *Plugh* case and other cases do not change the result, because those cases involve scenarios where a suspect has made or engaged in ambiguous or unclear statements or conduct with respect to invocation of his *Miranda* rights. *See Berghuis*, 560 U.S. at 379 (Defendant sat in silence for nearly three hours before making statements); *Plugh*, 648 F.3d at 124

(Defendant made ambiguous statement with respect to his rights and then refused to sign a written waiver). This argument does not speak to the issue of whether Defendant's alleged implied waiver was knowing, intelligent, and voluntary. *See Miranda*, 384 U.S. at 444; *Berghuis*, 560 U.S. at 382-83.

Finally, given all of the circumstances present in this case, Defendant's post-interview signing of the written waiver form does not weigh strongly in favor of finding that Defendant understood his rights and knowingly waived them *before* answering the agents' questions. This case is different from *Mir*, 224 F.Supp.3d 217, in that the accused in that case stated that he understood his rights before the interview began.[4] In the instant case, the post-interview signed waiver is not enough to overcome other evidence in the record that Defendant did not understand and knowingly waive his rights *before* the interview began. *See Missouri v. Seibert*, 542 U.S. 600 (2004) (*Miranda* warnings given after the defendant gave unwarned confession are ineffective.) Considering Defendant's prior statements conveying confusion and misunderstanding, the waiver signed after the interview, without more, is not enough to show that Defendant understood and knowingly waived his *Miranda* rights. The Government's Objection to the R&R will be overruled and the Motion to Suppress Defendant's Statements will be granted.

**2. Defendant's Objection to Admissibility of Statements for Impeachment Purposes**

The Government maintains that, even if Defendant's statements are suppressed, they are admissible for impeachment purposes on cross-examination because the agents did not make any improper promises, overbear Defendant, or coerce him in any way. (Doc. 27 at 9-11.) Defendant argues that his statements were not voluntary because Agent Dienstmann made improper promises of leniency in exchange for Defendant's cooperation with the interviewers. (Doc. 27 at 8; Doc. 46 at 10.) The R&R finds that Defendant's statements were voluntary and not the result of improper promises or coercion, and therefore are admissible for impeachment purposes. (Doc. 60 at 16-17.)

---

[4] Furthermore, *Mir* is an out-of-circuit district court case that is not mandatory precedent for this Court.

Defendant objects to the R&R's finding that the statements are admissible for impeachment. (Doc. 63 at 2-3.)

The prosecution may impeach a defendant with a prior inconsistent statement taken in violation of *Miranda* under two conditions: (1) the statement was voluntary; and (2) the statement was arguably inconsistent with the defendant's testimony at trial. *United States v. Gomez*, 725 F.3d 1121, 1126-27 (9th Cir. 2013). Any inconsistency between Defendant's trial testimony and his prior statements becomes relevant only if Defendant testifies at trial. *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). Therefore the key concern at this juncture is whether Defendant's statements were voluntary.

In determining whether a statement was voluntary, "the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000) (citing *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)). "An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect." *Guerrero*, 847 F.2d at 1366; *see also United States v. Brandon*, 633 F.2d 773, 777 (9th Cir. 1980).

Agent Dienstmann told Defendant that he would inform the prosecutor of Defendant's truthfulness and that the prosecutor would take that into consideration, but he also said that he could not make Defendant any promises. (Gov't Exh. 7 at 27-28.) These statements do not rise to the level of coercion or improper inducement. Even if the Court interpreted Agent Dienstmann's statement as a promise to inform the prosecutor about Defendant's cooperation, this would not rise to the level of coercion necessary to make Defendant's subsequent statements involuntary. *Guerrero* at 1366. Therefore, Defendant's statements were voluntary and are admissible for impeachment purposes on cross-examination if Defendant testifies at trial.

### B. Motion to Suppress Results of Defendant's Cell Phone Search

On October 18, 2019, Defendant filed a sealed Supplemental Memorandum raising arguments related to suppression of the results of a search of his cell phone, based on new information obtained by defense counsel since filing the initial Motion to Dismiss or Suppress (Doc. 46). Defendant contends that his consent to search his cell phone was involuntary because of the *Miranda* violations, citing *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960). (*Id*. at 7, 12.) The R&R concludes that Defendant's consent to search the cell phone was valid and recommends that this Court deny the Motion to Suppress on that ground. (Doc. 60 at 18.) Defendant did not object to this finding (*see* Doc. 63), and thus this Court reviews the finding for clear error.

Consent to a search is a non-testimonial act and therefore is not covered by *Miranda*. *United States v. Henley*, 984 F.2d 1040, 1042-43 (9th Cir. 1983) (citing *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977)). Furthermore, a *Miranda* violation does not require the suppression of physical fruits of unwarned but voluntary statements. *United States v. Patane*, 542 U.S. 630, 637-38 (2004). The case cited by Defendant in support of his initial argument does not say otherwise. *See Blackburn*, 361 U.S. at 205 (use of involuntary confession resulting in conviction violated due process clause of Fourteenth Amendment). The Court finds no error in Judge Markovich's R&R as to this issue. The request to suppress the results of the cell phone search will be denied.

### C. Motion to Dismiss Indictment

Defendant also moves to dismiss the indictment based on outrageous governmental misconduct resulting in a due process violation. (Doc. 22 at 8-9.) Defendant argues that the governmental conduct in the instant case rose to the level of "being repugnant to the American system of justice" and that such conduct warrants dismissal of the indictment. (*Id*. at 9); *see United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). Defendant contends that the presentation of his statements to the grand jury violated due process. (Doc. 46 at 8-9.) The R&R recommends denying the Motion to Dismiss because "the *Miranda* violations are not so shocking and outrageous to warrant

dismissal of the indictment" and therefore Defendant cannot meet the "extremely high standard" required for dismissal. (Doc. 60 at 18-19.) Defendant objects to the recommendation that his Motion to Dismiss be denied. (Doc. 63 at 3-5.)

Dismissal of an indictment for due process violations is warranted only if "the government's conduct [is] so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (citing *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir. 1983)). "The police conduct must be 'repugnant to the American system of justice." *Smith*, 924 F.2d at 897 (citing *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986)). "In short, a defendant must meet an extremely high standard." *Smith* at 897. Although "police deception might rise to a level of a due process violation," the deception would need to be so egregious as to "shock[] the sensibilities of civilized society." *Burbine*, 475 U.S. at 432-34 (no due process violation where police failed to inform suspect of his attorney's call and conveyed false information to attorney).

"[A]n indictment valid on its face is not subject to challenge on the ground that the grant jury acted on the basis of. . . information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States v. Calandra*, 414 U.S. 338, 345 (1974); *but see United States v. Basurto*, 497 F.2d 781 (9th Cir. 2004) (due process violation occurred where the prosecution knew indictment was based on partially perjured testimony). Grand juries are not subject to the Rules of Evidence and may consider evidence that would be inadmissible at trial. *See Bracy v. United States*, 435 U.S. 1301, 1302 (1978).

The Court agrees with the R&R's finding that the police conduct complained of by Defendant does not warrant dismissal of the indictment.[5] Defendant's Motion to Dismiss the Indictment will be denied.

. . . .

---

[5] In addition, the Government submitted a sealed supplemental filing indicating that Defendant's arguments concerning presentation of his statements to the grand jury have been rendered moot. (Doc. 79.)

## IV. Conclusion

The Court has reviewed Judge Markovich's Report and Recommendation, the parties' briefs, and the record. The record shows that Defendant's statements made during his interrogation by Border Patrol agents were obtained in violation of *Miranda* and therefore must be suppressed. However, his statements were voluntary and therefore are admissible for impeachment purposes on cross-examination, should Defendant testify at trial. Defendant's remaining requests lack sufficient evidentiary and legal bases and will be denied.

Accordingly,

**IT IS ORDERED** that the Government's Objection (Doc. 61) is **overruled**.

**IT IS FURTHER ORDERED** that Defendant's Objection (Doc. 63) is **overruled**.

**IT IS FURTHER ORDERED** that the Report and Recommendation (Doc. 60) is **accepted and adopted**, as set forth above.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss Indictment or Suppress Defendant's Statements (Doc. 22) is **partially granted and partially denied**, as follows:

1. Defendant's Motion to Suppress Statements is **granted**, as set forth above.
2. Defendant's Motion to Dismiss Indictment is **denied**.
3. Defendant's request to suppress the results of the search of his cell phone is **denied**.

Dated this 31st day of January, 2020.

_____
Honorable Rosemary Márquez
United States District Judge